Good morning, Your Honors. Kaveh Erdalan on behalf of the petitioner, who is incidentally in court with me today. Your Honor, this is a case that, before I start some of my argument, I'd like to mention that I was not the attorney of the record in the underlying proceeding. And actually, I wasn't even the attorney who filed the brief before the BIA. I came on court when the petition review was filed. I kept reading the record of the proceedings and tried to figure out what were the problems for the fact that the judge found the petitioner incredible. And initially, if you just read the decision of the immigration judge, you get a sense that, yeah, maybe something is wrong in this case. Then I went back and actually read the transcript. Then I read the bare-bone asylum application. Then, of course, I spoke with the petitioner. I am arguing before this court that I don't believe that there is any substantial inconsistency between his testimony and the questions that was asked to him at the time. Let me get to the point that concerns me, and maybe you can address that. The point that seems to be central is that he claimed to be persecuted as a Sunni all of his life. And yet he married a Shiite and kept his religion a secret. So you have sort of your client's, you know, qua devoted Shiite husband. You have him qua Sunni leader who is being persecuted. It's an inconsistency that seems to go to the heart of it, or the claim. And, I mean, one can see, if you think that's true, perhaps from a solipsistic point of view, if someone has a secret identity, bad things happen to them, and you think it's because somebody discovered the secret identity. But if that seemed inconsistent to the IJ, and I must say it seems that that seems to be, at least what I, it seems to me the central inconsistency. So tell me why you think it's not copacetic for the IJ to make that decision based on the record, even though you can read it both ways. Thank you, Your Honor. Actually, I was ahead of one of my sheets here. I'm going to try to get that three ways, factually, legally, and maybe off the record my personal experience. Just knowing the circumstances in Iran, as a native of Iran and, of course, a U.S. citizen, I happen to have a Shiite mother and a Sunni dad. That's just, it's not, I'm not offering it as, of course, as evidence in the proceeding, but he never claimed that my wife or her mother opposed the fact that I was a Sunni. All he says in page 144 and 145 of the transcript, the actual testimony, he says that I had told my wife and his mom that I'm a Sunni. They said, that's fine. This is when everything is fine. This is before the child is born. Everything is nice and dandy. The problem comes up is when some of his wife's family member, they openly insult one of the Sunni's caliphs, you know, the, I guess, Saint Omar, whoever he is, and he says, wait a minute, do you guys know that I happen to be a Sunni? So that is the initial problem. Now, separate and apart from that incident with the family, he claims that as a child, this is a person who was born in 1974 at age four and a half, the revolution on February 1979. He's four and a half years old. A year and a half later, at the heart of hostage taking, at the, maybe within a year from the war with Iraq, all of a sudden the country is polarized because the Kurds are kind of tacitly, are siding with Iraq in the war. Of course, they're opposing the Shiite Islamic government. When he goes to school, of course, in Tehran, in capital city of Iran, where the predominant is Shiite, of course, he's going to experience a problem. I, I'm sorry, I don't want to go there, but it's very consistent with the country report and it's very consistent with the experiences that maybe the other four million Kurds and altogether 10 million Sunnis have in Iran. Within the school, within some prejudicial environment, whether it's academic, school activities, sports activity, even some smaller workforces, yes, he does, you would have that problem. I thought, I have thought the inconsistency that the IJ pointed to, and correct me if I'm wrong, was this. He said, said that no one knew except his family about his religious beliefs, yet he had been persecuted his entire life. The question is, I think it's on page 144, Your Honor. The question is who knew, and I think his answer was that the family knew. My family. The wife's family, nobody knew. In school, they would know because it was a mandate after the revolution that the kids in school, they must pray during the lunch prayer. Of course, as a Sunni, he's taught to pray differently. Very notorious, very obvious way of doing it. His last name, his parents' last name, I mean, first name and the place of birth, it's obviously he's a Kurd. He's saying to the judge that, yes, the family member, my family members, I'm sorry, my wife's family member, they did not know that I was a Sunni. Of course, you know, he was born and raised in Tehran. He's talking, he doesn't have an accent of any Kurdish or whatever. He doesn't have any problem. Here's the question and answer from the transcript question. Sir, you testified that your wife and mother knew the fact that you were a Sunni. Answer, only these two individuals. That's the answer. Right. That's pertinent to the wife and the family members. Of course, they would know. When he's in military, of course, the superior officers, when there's a conscription and you go in there, you must disclose your religion and your sect. If you're a Jew or if you're Armenian, if you're a Zoroastrian or a Sunni in Iran, they would know that. It's within the system that you identify your religion. Or a Baha'i or a Christian. Christians are kind of rare because most of them are baptized. Yes, Baha'i, of course. But I didn't mention Christians other than Armenians because you must probably, most likely, you're not a native to Iran. You're baptized or you're a convert. Going back on that specific question, I think the answer, if you read not just the judge's decision, but if you read page 143, 144 and 145, you get the sense that the question is within the immediate family and friends, do they know? He says no. The wife, of course, knew. You have an intimate relationship with someone. You're proposing to someone. You're going to have a child with someone. She would know. Wife went to tell the mom and mom says, you know what, that's okay. Somebody else, whether dad, brother, uncle, somebody in the family on the wife's side started to raising that issue. All right. The problem here, though, is that the whole, it didn't seem to make sense to the IJ, and maybe you can make some better sense of it to me, that is your argument that he had a compartmentalized life that, you know, with his family, that at least he was trying to go along. I mean, you said he had to disclose he was a Sunni for every purpose except for his family life. No, no. What I'm saying is on the street, if you get on a bus, Your Honor, you don't disclose you're a Sunni. You don't have a tail. You don't have a special closing or whatever. When he went to the military, they knew. In school, of course, they knew. You have to disclose that when you go to public school, especially I'm talking about a child who was born in the middle of the revolution. So within the family, of course, the wife knew, but uncles and aunts and nephews and nieces and cousins, they wouldn't know until an issue comes up. What's the issue is the ritual, the annual ritual of insulting the Sunni's religion. I don't know but I would say, I guess, apparently, he had a fairly important government position or government-sanctioned position without any repercussions. Thank you, Your Honor. That's another cheat sheet point here. He never had a government position. He was drafted in the Army. They said, okay, you know what? Go become a radio operator. He never claimed he had an occupation. He was never paid for it. He was in the Army. One of the things he gets, okay, become a wireless operator at this rocket facility. Chinese are coming and training the Iranian officers or soldiers or whatever in manufacturing these silk rockets or whatever. There's nothing anywhere in his application or in his direct testimony that he says, I had a government job. All he said that 93 to 95, which is the two years that he served in the military, he was born in 74. 93, he's 19 years old. That's the exact age they pick him up for the Army. He goes in and becomes a wireless operator. What is so sensitive about a wireless operator? He wasn't designing anything. The environment, the city or, you know, the installation, the barrack was sensitive. But a wireless operator was not. They think that because he has access to somebody's communication or whatever, of course, he must have some kind of clearance or whatever. But he never claimed nothing in this transcript or the application. He never claimed that I had clearance, whether secret or top secret or classified. He was a 19-year-old with high school diploma. Who on earth would give this guy some kind of sensitive stuff? In his real life, he sells paint. He has no skills to get a sensitive job. This is the part what I'm saying. When you read the judge's decision, you get a sense that something is wrong. And I kept telling him, come on, tell me the truth. Tell me the truth. He says, listen, just read the entire transcript. It speaks for itself. He says at age, I'm running out of time, I guess. You are out of time. Finish up in a sentence. May I just save maybe a minute to come back for rebuttal? If you want to, if you stop right now. Thank you so much. Mr. O'Connor. Good morning, Your Honors. I am Glenn O'Connor representing the Attorney General on this matter. May I start with a different question? What's wrong with staying these proceedings to allow the adjustment of status to go forward? A number of reasons, Your Honor. First of all, the Supreme Court case of Stone v. INS makes clear that the review of a removal or deportation order or obviously an asylum application, because these are asylum-only proceedings, a petition for review of that is in no way affected by subsequent actions that may or may not give the person a right to stay. Also, the second point is that because this is asylum-only case, this Court would never have jurisdiction to review the adjustment application anyway, because the application would be made straight with the agency. Would there be no appeal of that? I understand. So the question, though, is they've asked for a stay because they have a different administrative remedy. Now, granted, we don't have any jurisdiction at this juncture over that remedy. But in fact, I mean, as you're talking about breaking up a family, you're talking about doing something that may not – that, frankly, in many contexts we see, it doesn't make a great deal of sense to me. So we have discretion, perhaps, to grant a stay. Why is the government opposing a stay to allow someone to pursue their remedy to adjust their status of marital grounds in the United States? Your Honor, the government would oppose this Court doing it because, you know, Congressman had amended the INA with its judicial review provisions, did reflect an intent that judicial review should proceed accordingly. I've already discussed with the opposing counsel prior to this argument that he can make a request to the agency that, you know, look, he just needs to show that the marriage is valid. He's not – he's not going to oppose – should he – should this Court deny him relief and he have the removal order. He's not opposing the fact that he is removable to Iran. But, you know, he can always apply at the agency to get them to delay until at least he has an opportunity to show that the marriage is valid. Well, what we've done in some other contexts when it appears that the government is resisting on a technical ground and an important ground – I mean, I know you have the philosophy you ought to go ahead and decide the cases and not worry about collateral matters. But we've done – we've referred this to our circuit mediator to see if something can be worked out so that the agency and the petitioner are satisfied and that we aren't – we're handling this as an organic whole as opposed to chopping it up and making decisions which at the end may not make sense. I mean, if you've got a couple that is – they're settled here, contributing here, and the agency doesn't necessarily oppose adjustment of status, it doesn't make much sense for us to say, well, okay, let's send them out of the country and see what happens. Yes, Your Honor. I mean, the government does recognize that we do have the resources of the mediation branch in this case could be referred to them. I would just make the point that if, you know, if that were to happen and we couldn't come to negotiations, we would ask that this Court not delay a decision in this case by virtue of the fact that, you know, it could take some time to have the visa petition adjudicated and also for him to meet his burden of showing that the marriage is in fact legitimate because it's been entered into after he's already been in proceedings. Right. Okay. Thank you. Well, would you object to having a stay for a period of time which would allow you to explore mediation as suggested by Judge Thomas, let's say 30 days? Again, Your Honor, the government would like a decision, but if this Court should find that that is just, I mean, the government's not going to... If we were under a stay for 30 days, and then if both parties say, well, we haven't been able to settle this case or either party says that, then we would go to work and decide the case. Your Honor, I mean, the government would not have no heartburn with that. We've had different results for that. I mean, in one case that I called recently, in fact, the deal was worked out and there was an adjustment of status and we lifted the stay just the other day and finally dismissed it. It ended up as a voluntary dismissal of the petition for review. In another case, the agency denied the adjustment of status and we went ahead and issued the decision. So we've done it before. Do you have any objection to mediation? Okay. Polly, would you come forward? We take them down to Mr. Lombardi's office and see if we can get mediation started. Thank you. You don't want me to address the merits, Your Honor? No, we understand your brief. As opposed to the one I criticized the other day. I'll be sure to let my colleague know I'm briefing, Your Honor. Thank you. Okay. Thank you, Your Honor. Thank you both. We appreciate you attending in person too, your clients attending in person. Thank you. We'll proceed now to the last case on the calendar for the day.
judges: Hawkins, Thomas, Bea